UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OSHAY LARAY PULLEN,<br><br>Defendant. | Case No.: 1:20-CR-00195 JLT<br><br>ORDER DENYING MOTION TO SUPPRESS<br>(Doc. 43) |

Oshay Pullen contends that officers stopped the car in which he was a passenger without a legally cognizable reason for doing so. Consequently, Mr. Pullen moves the Court to suppress the evidence seized on October 21, 2020, as a result of the car stop. Because the Court finds that the officers lawfully stopped the vehicle, the motion is DENIED.

I.  **Background**

On October 21, 2020, officers with the Fresno Police Department were conducting a "gang-enforcement operation," which included an intended "parole-compliance check on Oshay Pullen." (Doc. 37-1 at 5.) Officers understood that Mr. Pullen was an "influential" member of the Modoc Boys criminal street gang. *Id*. His criminal history included convictions for shootings and firearm possession. *Id*. He had recently been arrested on a parole violation for being with another gang member, who was armed with a firearm. *Id*. at 4. Due to the information being transmitted from his ankle monitor, officers knew that Pullen was at 4026 N. Fruit Avenue, in Fresno, California, near

1

apartment 248, which was his sister's home. *Id*. Officers were stationed around the apartment complex to conduct surveillance. *Id*. While parked some distance from the apartment, Detectives Lara and Moreno reported they saw a woman and a man, matching Pullen's description and wearing a yellow hoodie, leave the apartment and walk to the parking lot. *Id*

Indeed, that morning, Pullen was visiting his sister, Lashell Wallace, at her apartment. (Doc. 36 at 8). After a while, Pullen and Wallace left the apartment to leave in Wallace's car, a Kia Soul. *Id*. Pullen was wearing a yellow sweatshirt, with the hoodie pulled over his head, which obscured his face. (Doc. 37-1 at 10) Detective Lara saw the man enter the backseat of the Kia—leaving the front passenger seat unoccupied—and crouch down. *Id.* The officers noted that the front windows were tinted. (Doc. 60 at 12)

By that time, the officers knew Pullen was subject to suspicionless search and seizure. (Doc. 60 at 23-23, 118). They knew also that he was a gang member carried firearms. (*Id*. at 23, 31, 116, 126, 129, 167, 168, 169, 170, 182. As the officers waited in their car, preparing to follow the Kia, they saw it pass behind. From that vantage point, they again saw that the driver-side window of the Kia was tinted. (*Id*. at 16, 17, 161) Believing the man wearing the hoodie was Pullen, Detectives Lara and Morena followed in their car. (Doc. 37 at 9) During this time, another detective, Garcia, contacted Pullen's parole officer who informed him that the data from Pullen's ankle monitor showed it was moving consistently with the traveling Kia. (Doc. 37-1 at 5) The officers confirmed the consistency of the movement with the GPS data about "20 times" while following the Kia. (Doc. 60 at 28)

After leaving the parking lot, Lara reported he saw the car accelerate rapidly to about "60 mph in a 35-mph zone," after turning onto Ashlan Avenue, which he believed constituted a violation of California Vehicle Code section 22350. (Doc. 37-1 at 5; Doc. 60 at 20, 21) Lara reported that the Kia began accelerating away from them "just east of Thorn" Avenue. (Doc. 60 at 19) Lara reported that he did not make a traffic stop at that time due to the Kia's speed and abrupt lane changes and because of traffic congestion. *Id*. Instead, Lara followed the car as it entered onto Highway 41. *Id*. Lara and Moreno followed the car after it left the freeway, westbound on McKinley Avenue. *Id.* After the Kia turned onto Fresno Street, Lara made a traffic stop on the car. *Id*.

After the car stopped, Lara saw Pullen make a "furtive movement to the left of the back seat

area and jumped into the right front seat." (Doc. 37-1 at 10) Moreno stated, "Watch out. He's moving around a bunch. Watch out. He's moving around." (Gov. Ex. 4) As Pullen opened the front passenger door, both Moreno and Lara drew their weapons and got out of their undercover patrol car. *Id*. While Lara yelled at him to get on the ground, Pullen left the Kia with his hands up and immediately lay face down on the ground. *Id*. Lara and Moreno approached Pullen with their gun drawn and pointed at Pullen. *Id*. Lara put his left foot on Pullen's back, while other officers approached and helped Lara be placed into handcuffs. *Id*. During this time, Moreno was on her radio telling dispatch that they had stopped the car and that Pullen was trying to "leg it." *Id*.

After Pullen was placed in handcuffs, Garcia arrived and told the other officers to move Pullen away from the car. (Gov. Ex. 5) Garcia searched Pullen's body and found "a mag" in Pullen's front right pocket. *Id*. Another officer looked in the back seat of the Kia and saw part of a gun sticking out from underneath a child's car seat. *Id*. Garcia unhooked the car seat and discovered a handgun with a magazine inserted into it. *Id*. Garcia removed the magazine and examined the gun and stated, "It's a ghost." *Id*.

Officers also took Wallace out of her car. (Gov. Ex. 4) In response to Wallace's questions, Moreno and another officer reiterated that Pullen was trying to run. *Id*. Wallace asked Moreno, "What's going on?" *Id*. Moreno responded by saying, "We were just going to pull you over for something simple. Then Mr. Pullen tried to move around a bunch in the backseat . . . We knew he was in the car, and we were going to do a compliance check on him. We saw him moving around a bunch in the backseat, and then he popped the door open like he was about to run. That's why we came at you like we did . . ." *Id*. She continued, "It was his movements and his actions, not yours." *Id*. Later Ms. Wallace wondered at the ability of the officers to see Pullen. *Id.* She mused that the tinting on the windows in the backseat were tinted "more than in my front" windows. *Id*. "So that's why I got pulled over, 'cause of him?" *Id*. Moreno responded, "That's all. Yeah" *Id*.

**II.   Analysis**

Mr. Pullen makes a two-pronged attack on the seizure at issue. First, he asserts that the traffic stop lacked legal justification. Second, he asserts that even if the traffic stop was legal, the officers could not search the vehicle because he lacked control over it.

### A. The law allowed the officers to perform a traffic stop.

It is the government's burden to justify a vehicle stop, just as it is its burden to justify warrantless searches. *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir.2012) (government's burden to show reasonable suspicion for vehicle stop); *United States v.Carbajal*, 956 F.2d 924, 930 (9th Cir.1992) ("The burden is on the Government ... to show the reasonableness of a warrantless search. This includes demonstrating that the search comes within one of the narrow exceptions to the warrant requirement.") (internal citations omitted). However, it is established law that an officer's subjective intent in making a traffic stop "does not make otherwise lawful conduct illegal or unconstitutional." *Whren v. United States*, 517 U.S. 806, 810 (1996), quoting *Scott v. United States*, 436 U.S. 128, 138 (1978). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* Officers must have only reasonable suspicion that a traffic infraction has occurred to make a traffic stop and the fact that the officer does not, ultimately issue a citation or even mention the traffic infraction, does not translate the stop into an unconstitutional seizure. *United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005). Thus, Pullen's assertions that the officer intended to make the traffic stop before ever seeing a traffic violation does not advance the analysis.

### B. The officers had significant reason to believe Pullen was in the Kia

Pullen argues also that the officers were unsure that he was in the vehicle they pursued. In doing so, he seems to argue that the pursuit was illegal from the onset. However, the evidence from the ankle monitor data, which was provided to them in real-time, supports the officers' reports that they had reason to believe that Pullen was in the vehicle.

At the hearing, Jeff Marino, a crime analyst with Securus Monitoring testified. Securus monitoring is the company that provides the GPS tracking of Mr. Pullen's ankle monitor. Mr. Marino testified that the data is accurate. He has personally tested the equipment and found it to be accurate to date and time. (Doc. 67 at 43, 52-53, 65) In addition, he testified as to the high confidence in the data collected on Mr. Pullen's ankle monitor during the relevant period. (Doc. 67 at 50-54, 58-59, 67; Ex. 6)

Lawrence Daniel testified that if a person was following a car on a freeway knowing it had a GPS transmitting device inside it, "there's no question this technology would be helpful in finding that

vehicle. I don't think there is a question about that." (Doc. 67 at 76.) As the officers followed the Kia, they received many updates as to the location of Mr. Pullen's ankle bracelet. This supported the conclusion that Mr. Pullen was traveling in the Kia driven by Ms. Wallace.

On the other hand, Officer Moreno testified that she had met Mr. Pullen two or three times before that day. (Doc. 66 at 137) When she saw the man in the hoodie approach the Kia with Ms. Wallace, she was nearly certain it was Pullen based on several factors. *Id.* She testified, "The fact he was on GPS and was coming out of and was near the area where the GPS was being tracked to, the fact that he walked down the staircase leading up to the apartment we knew was possibly involved, and the fact that his -- like I said, only his hands were exposed, and because of his physical build, based on those three factors, I believed it was possibly Mr. Pullen. And like I said, I couldn't see his face, which I am very familiar with. That I know 100 percent. So the fact that it -- I wasn't able to see his face, it was not 100 percent, but a confirmation that that was Mr. Pullen. It was a very, very likelihood that it was, but not 100 percent." *Id.*

Coupled with this information, the information provided by the GPS monitoring and the fact that person entering the Kia crouched down in the back seat, the Court finds the officers had a significant basis to believe that Mr. Pullen was riding inside the vehicle.

**C.     The officers had reasonable suspicion the Kia's window tinting violated California law**

California law prohibits tinting of the front windows. California Vehicle Code section 26708(a)(1) provides, "A person shall not drive any motor vehicle with any object or material placed, displayed, installed, affixed, or applied upon the windshield or side or rear windows.[1]" It is undisputed that the Kia had tinting on every window except the windshield. The dispute concerns the opacity of the tinting.

The videos from the bodycam footage show that the front windows are tinted. (Ex. 4, 5) Lara testified that when the Kia drove behind the patrol car, while he and Officer Moreno were parked at the apartment complex, he could not see clearly into the driver's window and saw, instead, a

---

[1] An exception is for side windows that "are to the rear of the driver."

5

silhouette. At the time, it was about 4:00 to 4:30 p.m. (Doc. 66 at 16) and the Kia was driving in a northwesterly direction. (Ex. 10)

Officer Moreno also testified that she saw the Kia's front windows were tinted and that she couldn't see "details" and she could only see silhouettes. (Doc. 66 at 153-154) She testified that the back windows were dark, the front windows were light, and the windshield had no tint. *Id*. at 154-155. Defense investigator, Mr. Motorana testified that the windows were tinted. (Doc. 66 at 219) The photos he took show the tinting on the windows, though the opacity appears less pronounced,[2, 3] (Ex. Q-5, Q-7, Q-8) This is consistent with window-tint expert Jacob Brown's testimony that window tint can look lighter or darker depending upon the lighting conditions of the day, whether a door of the car is open and the light inside the vehicle. (Doc. 80 at 79-80) Even without this testimony, it is within the common experience that lighting can impact how dark window tinting appears.

Even still, Pullen argues that if the windows were illegally tinted, the officers should have stopped the car earlier. Pullen offers no citation to legal authority that a police officer loses the authority to perform a traffic stop if it does not occur immediately upon the discovery of the violation. Indeed, in *United States v. Willis*, 431 F.3d 709, 716-717 (9th Cir. 2005), the Court found no error in an officer continuing to follow a car after having witnessed a traffic violation, to watch whether further violations would occur. In any event, according to the ankle monitoring information, the entire pursuit lasted only about 11 minutes. (Doc. 37-3 at 4-5) Thus, because the evidence demonstrates that the Kia's front windows were tinted, the officers had reasonable suspicion to stop make the traffic stop.[4] Thus, the motion to suppress is **DENIED**.

### D.     The officers had reasonable suspicion the Kia was speeding

Officers Lara and Moreno followed the Kia, which was driven by Mr. Pullen's sister, after she

---

[2] The Court notes that in photos Q-I and Q-6, the adjacent door is open, allowing in more light, which is a different factual circumstance than the officers observed.

[3] Mr. Motorana testified he took the photos at about 5:30 p.m. (Doc. 66 at 218) There is no evidence as to whether the lighting circumstances on March 26, 2021 was similar to the lighting on October 21, 2020 at 4:30 p.m.

[4] Ms. Wallace disputes that she was speeding. She submitted a declaration denying that she was speeding and denying she ever drove on the freeway that day. (Doc. 36-1 at 2) The evidence, however, belies both of these claims, as Pullen seems to concede. The ankle monitor data demonstrates that, in fact, she drove on Highway 41 and that, at least at one point, she was driving 73 miles per hour. (Doc. 37-3 at 4, 5).

1 left the apartment complex and drove onto Fruit Avenue and then onto Ashlan Avenue. (Doc. 66 at 17,
2 19-21) Lara saw the vehicle speed up as it approached Thorn Avenue. *Id*. He testified, "It was rapid
3 pace. It wasn't at a gradual pace like normal -- normal drivers would accelerate. It was at a rapid pace.
4 I wouldn't say the vehicle was -- was – was dangerously speeding, or it was breaking traction or
5 anything like that, but the vehicle was accelerating rapidly compared to other vehicles in that area at
6 that time." *Id*. at 21. Officer Lara said he was driving about 35 to 40 miles per hour and the Kia was
7 "pulling away from us." *Id.* He estimated that it reached a top speed of about 60 miles per hour. *Id.*
8 Moreno also noted the Kia was speeding, though she did not estimate the speed. *Id*. at 141. Ashlan
9 Avenue has a speed limit of 35 miles per hour.[5] *Id*.

Though Mr. Marino would not testify as to the estimated average speed that ankle monitor was traveling at any given reported location, and he indicated that Securus Monitoring does not "certify" speed, he testified that the developers included an algorithm to calculate the speed in the data output. (Doc. 67 at 60-62. Indeed, the report produced indicates that at TP145, the ankle monitor was traveling 45 miles per hour (Ex. 3), which is consistent with Officer Lara's testimony and that of Fresno Police Detective Brian Hance that the Kia was accelerating toward Thorne Avenue.

Detective Hance used the data taken from Mr. Pullen's GPS location monitoring ankle bracelet and calculated the average speed the Kia traveled between various points on Ashlan Avenue. (Doc. 66 at 100, 101) During one 15-second interval, the Kia travelled, on average, 39 miles per hour. (Doc. 14) During the next 15-second interval, the Kia travelled, on average, 37 miles per hour. *Id*. In the final 15-second interval, the Kia travelled, on average, 20 miles per hour. *Id*. Unless the vehicle travelled at a constant speed, the Kia went faster and slower in equal measures than the average speed. (Doc. 66 at 101-103) Thus, the Court cannot say that Officer Lara's visual estimation of the Kia's speed as 60 miles per hour, is implausible. Even if the Court completely ignored the visual estimate of the speed

---

[5] Vincent Lee testified that he drove the route at issue in this case and made a video while he was doing it. (Doc. 67 at 83) The Court notes that the trip occurred at a different time of year and time of day from when the actual pursuit occurred. (Doc. 67 at 83) Nevertheless, the video provides illustrative context for what the officers saw. (Ex. R) For example, the view up Ashlan Avenue, when turning onto it from N. Fruit Avenue, is wide open and unobstructed. *Id*. Also, there are traffic signals at N. Thorne Avenue, N. Palm, Maroa and Blackstone Avenues. *Id*. Also, despite the presence of other cars, a vehicle traveling as the officers did on Ashlan Avenue, could see cars ahead.

7

offered by Lara, it is indisputably true that the Kia was traveling faster than the speed limit allowed. Thus, the motion to suppress is **DENIED**.

### E. The law allowed the officers to search Pullen's person.

According to the terms of his parole, Mr. Pullen's person was subject to search. Cal. Pen. Code § 3067. The evidence demonstrates that the officers were aware of Pullen's parole status. Indeed, the purpose of seeking him out on that day was because he was on parole and because was a member of a criminal street gang who had been arrested a short time before for possessing a firearm. (Doc. 37-1 at 5) Officer Garcia had previous contact with Mr. Pullen at which he was with three or four other gang members and the had two firearms were located. *Id*. at 169. Also, another MAGEC Team member had informed Garcia that in an earlier traffic stop involving Pullen, another firearm and another gang member was found in that vehicle. *Id*. In addition, Garcia was aware that, in the past, Mr. Pullen had violated his parole when he was found to be in possession of a firearm.[6] *Id*. at 170.

Detective Garcia conducted the search of Mr. Pullen's body knowing that it was Pullen he was searching, due to the ankle monitor data that "continued to match up to the location of the vehicle as he traveled throughout the city," and he knew that Pullen was on parole. (Doc. 37-1 at 5) In doing so, Garcia found a "12 round capacity magazine for a Glock 40 caliber firearm" in Pullen's left front pants pocket. (*Id*; Ex. 5) This search was permitted under the law.[7] Thus, the motion to suppress is **DENIED**.

### F. The officers were entitled to search the Kia

Pullen argues that the officers' were not allowed to search Ms. Wallace's car based only upon his parole status. (Doc. 36 at 16-17) The Court need not address this contention because the facts of this case justify the search of the area of Ms. Wallace's car that had been within Pullen's control.

As Lara and Moreno stopped the vehicle, they saw Pullen making furtive movements in the

---

[6] The officers testified also that Garcia had viewed social media posts in which Mr. Pullen was posing with firearms. Though there is much dispute over the credibility of this information, the Court need not resolve the dispute because the information known to the officers aside from this post is sufficient to explain the officers decision to seek Mr. Pullen out and for the safety concerns they had while doing so.

[7] The Court has been offered no cogent argument that this search was not permitted. Rather, Mr. Pullen bases his objection to this search on his argument that the traffic stop was illegal. Because the Court rejects that argument, the search of Mr. Pullen's body is unassailable.

1 backseat before moving to the front seat. (Ex. 4) In the bodycam footage, upon the cars coming to a
2 stop, Moreno is clearly focused on Pullen in the back of the Kia and spontaneously stated—while
3 drawing her weapon—"Watch out. He's moving around a bunch," and then she repeated more
4 emphatically, "Watch out. He's moving around." *Id*. She repeated this information again while talking
5 to Ms. Wallace. *Id*.

6  Moreno testified that before the car yielded to the officers, "I saw a male's head pop up from
7 the back seat . . . So I saw a male head pop up, based on the short hair, and look back towards me. So I
8 could see the head turn back towards our vehicle. I could also see the driver hand back what appeared
9 to be a cell phone, and you could tell by the illumination of the front screen and the like it was getting
10 passed back to him." (Doc. 66 at 123-124) This conduct was concerning because,

> we don't know what they're doing. We don't know if they are concealing something. We don't know if they're planning to -- if they have weapons, and if they're planning to shoot towards us.
> Like I said, when you work in an undercover capacity, there are times where I have interviewed subjects and they make the claim that they thought we were rival gang members, and that we were -- they were going to be shot at.
> So you don't know what they're thinking. You don't know what their thought process is. You don't know what their thought process is going to be. So when they're moving around feverishly and movements like that, it starts to raise your suspicions about what their next move is going to be.

17 *Id*. at 124-125. Moreno testified that after the car stopped, Pullen crawled into the front seat and exited
18 from the front passenger seat, rather than from the back passenger seat. *Id*. at 125. Moreno drew her
19 weapon as she saw Pullen's conduct, "Because of the fact of his movement. Like I said, we
20 don't know what he's thinking, what he's planning. We don't know if he's arming himself with some
21 type of weapon. And knowing Mr. Pullen's history, and knowing the fact that he was just pictured in
22 videos with a firearm, and we believed that he was possibly in possession of that firearm, we don't
23 know if he's going to use it, to point at us, shoot at us, harm us in some way." *Id*. at 126.

24  Likewise, as further evidence that Moreno saw furtive movements, after Mr. Pullen was
25 secured by the other officers, she immediately went to the area of the car seat in the backseat and
26 searched it. *Id.* Thus, the suggestion that Moreno made up the information of Mr. Pullen's "furtive
27 movements" later to justify the search is not supported by any evidence and or any inferences to be
28 drawn from the evidence. Moreover, the vehicle was impounded and towed due to Ms. Wallace failing

9

to have a valid license. In connection with the impoundment, officers conducted an inventory search. (Doc. 37-1 at 6) Thus, it was inevitable that the firearm hidden under the car seat would have been discovered. *Nix v. Williams*, 467 U.S. 431, 443 (1984). Consequently, the officers were entitled to conduct the search, and the motion is **DENIED**.

### G. The time, place and manner of the search did not violate the Fourth Amendment

Pullen argues that the time, place and manner of the search was an independent violation of the Fourth Amendment because it was arbitrary, capricious and harassing. (Doc. 36 at 18-19)

First, as noted above, the Court finds that, by the time the officers stopped the Kia, they were certain that Mr. Pullen was inside. Thus, Pullen's argument that the officer's pulled over an "unknown third party's vehicle in the hopes of finding a parolee to search" is rejected. Second, the number of officers and patrol cars present was a function of Mr. Pullen's past criminal conduct, in which he had been found with known gang members and with firearms, due to his criminal history and his status as a validated gang member. Also, the number of officers and cars at the site of a traffic stop conducted by the MAGEC team, in general, is higher due to the danger posed by those the team seeks. Officer Moreno testified they have so many people at their traffic stops,

> . . . because of the caliber of people that we're going after, meaning we're going after violent criminals who have some type of criminal history. We tend to investigate -- more often than not, I would say, it's very rare that we don't investigate an active gang member. Most of the times there are multiple of them. It's not just one person. We know that the people that we're going after have a history of violence. They tend to run. They tend to flee either in a car or on foot.
> So typically, for our safety, we like to have more personnel there than just two people on two people. Just for containment.

(Doc. 66 at 127) She explained they have so many cars coming from different directions,

> Like I said, for containment. On that team, a lot of us that are -- it's not brand new. You don't choose brand new officers. These are officers that have years on the job either at Fresno PD or somewhere else. They're experienced officers, experienced detectives, who have knowledge of – of these kinds of acts.
> And the other reason is, it's kind of a -- it makes that person, whoever we're going after, second guess whether they really want to flee once they see they're obviously out numbered. When they see there's obviously eight or nine of us, they're going to think, Okay, there's no way this is going to happen; versus two officers, and saying, Okay, I can probably get away from this.

*Id.* at 127-128.

Third, the furtive movements discussed above justified the officers pulling their weapons and

shouting commands. The fact that Mr. Pullen got out of the vehicle without being asked to do so, heightened the officer's concern for their own safety and for that of the public and raised concern that Mr. Pullen was attempting to flee. Finally, causing Ms. Wallace to exit her vehicle is not, on the facts presented here, a violation of the Fourth Amendment. Even if it were a violation, it is not a right that Mr. Pullen can enforce. For these reasons, the Court does not conclude that the search violated the bounds of reasonableness.

## ORDER

Based upon the foregoing the Court **ORDERS**:

1. The motion to suppress is **DENIED**.

2. The Court sets a further status conference before Judge Sheila K. Oberto on October 5, 2022 at 1:00 p.m.[8]

IT IS SO ORDERED.

Dated:   **September 29, 2022**

UNITED STATES DISTRICT JUDGE

---

[8] The parties may stipulate, with an adequate time exclusion, to a different status conference date.

11